BOYD, Justice,
dissenting.
I dissent to discharge of the writ because in my opinion the district court’s decision in this cause, reported at 336 So.2d 612 (Fla.2d DCA 1976), conflicts with Jordan v. State, 293 So.2d 131 (Fla.2d DCA 1974).
On November 28, 1972, petitioner Huffman was convicted of one count of rape and one count of breaking and entering with intent to commit a felony under aggravating circumstances. He was sentenced to two concurrent life terms. On appeal, the lower court judgment was affirmed, but the life sentence for breaking and entering was reduced to fifteen years since the intent to assault (i. e., to rape) was formed after petitioner entered the dwelling. Huffman v. State, 301 So.2d 815 (Plaid DCA 1975).
In January, 1975, Huffman filed a Motion to Vacate Sentence (Fla.R.Crim.P. 3.850) claiming denial of his constitutional rights by the trial court’s refusal to entertain defense counsel’s challenge to the composition and selection process of the all white jury.
In the motion Huffman claimed that he was denied a fair trial by an impartial jury drawn from a representative cross-section of the community because of racial bias in the jury selection process. The trial court denied the motion and the District Court of Appeal, Second District, affirmed per cu-riam. 336 So.2d 612 (Fla.2d DCA 1976).
Jordan and the instant case are quite similar. They both involve the rape conviction of a black defendant by an all white jury. The chief complaining witnesses in the respective cases were also white. The two trials were held in Sarasota circuit court; Huffman’s only two months earlier than Jordan’s.
The district court reversed the conviction of Jordan on the basis that he had made a prima facie showing that the jury selection process deprived him of his constitutional right to an impartial jury. Jordan, 293 So.2d at 134. The State did not then meet its burden in rebutting this prima facie case.
The Jordan court found that there was opportunity for the jury commissioners to racially discriminate during the jury selection process. The commissioners would select four or five precincts out of the forty-five in the County. The jury lists were then drawn from the voter registration cards, upon which the race of each voter was indicated. The commissioners would examine each card to determine if the listed voter was qualified to serve on a jury. After qualified prospective jurors had been winnowed out, the names were put in a *7 “jury drum” from which a master venire was derived. The Jordan court also noted that out of the 1344 prospective jurors, there were only four black voters on the master list. The jury that convicted Huffman was drawn from the same venire.[1]
The Jordan court stated that the defendant had made a prima facie showing of unconstitutional racial bias in jury selection by demonstrating that there was an opportunity to discriminate[2] and there was a “substantial statistical disparity between the proportion of blacks selected and the proportion of blacks eligible for jury duty.”[3] Jordan, 293 So.2d at 133. Citing Alexander v. Louisiana, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), the court stated that once such a prima facie case is presented the burden shifts to the State to rebut the presumption that the venire panel is unconstitutionally composed. The prima facie showing was not rebutted by the state; thus Jordan’s conviction was reversed.
At the conclusion of the opinion the district court stated the following:
“ . . . [U]nless the challenge to the precinct system was made and decided prior to trial in any other case, the right to object is considered to have been waived.” Jordan, 293 So.2d at 134.
Similarly this Court has stated:
“Although we are required to hold that there were arbitrary exclusions in the selection of the jurors, those who have been convicted can receive no comfort from this decision. A challenge to the panel, or challenge to the array, is used to question the selection or drawing of prospective jurors. Such a challenge must be made and decided before any independent juror is examined . . ..” State v. Silva, 259 So.2d 153 (Fla.1972).
As a portion of the trial transcript, infra, indicates, Huffman’s counsel challenged the venire panel prior to voir dire but was prevented from presenting a prima facie case of racial bias in the selection process. Counsel stated that he was prepared to interrogate the Jury Commission. The trial judge refused[4] this request and stated that he would allow counsel to question the Supervisor of Elections instead. The record indicates that both counsel and the trial judge knew that inquiry of the Supervisor would be futile.
The challenge to the array was made orally, prior to voir dire. The transcript reads in pertinent part:
“MR. HASTINGS: ... We would move to strike the panel as it exists at the present time, that is the prospective jury panel, prior to the selection of the jury in this matter. And as our consideration there is the following. The defendant is — is a person of the negro race and the chief complaining witness is a person of the white race. The entire panel, at least from a visual perusal of same on behalf of counsel, is constituted of white people. While I have an abiding faith personally in the system of justice at the very same time I think from a constitutional stand point it raises the question as to whether or not the defendant will have in the final analysis a jury of his peers. “Now, if the Court would permit me I would be prepared to make the proper interrogation of the Jury Commission that I would assume that is here in Sarasota County to determine whether or not there is systematic exclusion of blacks from juries in Sarasota County. . *8 “And that being the case I question seriously whether or not Sarasota is — that is, the County structure for selection of juries is — is in compliance with regulations that the United States Supreme Court has enunciated regarding fair trial and of a person being allowed to receive a jury of their peers ... I would just like for the purposes of Mr. Huffman’s record to have that reserved as a question.
“THE COURT: Would you like to interrogate the Supervisor of Elections? I can arrange to have her here and I think she can speak for them for your record.
“MR. HASTINGS: ... No, sir, Judge, I would be prepared to proceed and respectfully ask the Court’s indulgence in that regard and understand full well that I have placed on the record that the jury panel is white. I think I know what the Supervisor of Elections would say, that they are extracted from the voting rolls without imputing anything to color.
“THE COURT: I am sure that would be the case. . . .”
Thus, it appears that while trial counsel was prepared to make the prima facie showing of a systematic exclusion of blacks from the County’s juries, the judge refused to allow him the opportunity to do so. From Jordan we know that there could have been shown a prima facie case that the State would not have been able to rebut. Therefore, Huffman’s Motion to Vacate Sentence should have been granted.
The district court’s decision to uphold the denial of the motion conflicts with Jordan. It should be quashed.
HATCHETT, J., concurs.

. Jordan, 293 So.2d page 133, indicates that the list was compiled in October, 1972. Huffman was convicted in November, 1972. A new list was not drawn in the interim. (See footnote 2 in text.)

. Race was indicated on the voter registration cards.

. 2.65% of registered voters were nonwhite, while .297% of prospective jurors were black. Jordan, 293 So.2d at 133. The odds, therefore, of having a black on a jury in Sarasota County at the time of both Jordan and Huffman was only one in ten million. Jordan, note 4.

.There is a refusal implicit in the judge’s counter offer of the Supervisor of Elections rather than the Jury Commission; the latter was exclusively and ultimately responsible for jury selection.